**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PARKRIDGE PHASE TWO ASSOCIATES,
Plaintiff-Appellant,

v.

No. 98-1208

LOCKHEED MARTIN CORPORATION;
LMC PROPERTIES, INCORPORATED,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-97-623-A)

Argued: December 2, 1998

Decided: February 2, 1999

Before WILKINSON, Chief Judge, MURNAGHAN, Circuit Judge,
and HERLONG, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Paul A. Kaplan, DAVID, HAGNER, KUNEY & DAVI-
SON, P.C., Washington, D.C., for Appellant. Robert Foley Flinn,
FLINN & BEAGAN, Vienna, Virginia, for Appellees. **ON BRIEF:**
Erik D. Bolog, DAVID, HAGNER, KUNEY & DAVISON, P.C.,
Washington, D.C., for Appellant. Mathew D. Ravencraft, FLINN &
BEAGAN, Vienna, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Parkridge Phase Two Associates ("Parkridge"), as landlord, filed a complaint against Lockheed Martin Corporation and LMC Properties, Inc. (collectively "Lockheed") on April 25, 1997, alleging violations of obligations under two leases and alleging waste under Virginia Code § 55-211. Lockheed moved for summary judgment. On December 19, 1997, the district court denied the motion, with the exception that it granted Lockheed summary judgment on Parkridge's claim for holdover rent. On January 12, 1998, the remaining claims proceeded to trial. Lockheed successfully moved for judgment as a matter of law at the close of plaintiff's case. Finding no error, we affirm.

I.

Parkridge owns and leases a commercial office building in Reston, Virginia. Lockheed leased the entire building, with the exception of a first-floor deli, via two separate leases -- the "1986 Lease" and the "1988 Lease." These leases covered separate portions of the building, and both leases terminated on December 31, 1996. The 1986 Lease, among other things, required Parkridge to install all of the initial tenant improvements for Lockheed; allowed Lockheed to make nonstructural changes and additions to the building without Parkridge's consent; required Lockheed to surrender all improvements at the expiration of the lease; required Lockheed to perform alterations to the property in a workmanlike and lawful manner; required Lockheed to give notice of any changes affecting the mechanical or electrical systems; and required Lockheed to leave the premises broom clean and tenantable. The 1988 Lease, among other things, required Parkridge to install all of the initial tenant improvements; allowed Lockheed to make nonstructural alterations to the building without Parkridge's consent; required Lockheed to obtain written approval for alterations affecting the building systems; required Lockheed to perform all

2

alterations in a workmanlike and lawful manner so as not to adversely affect the value, utility, or character of the premises; required all improvements that were part of the original buildout by Parkridge to be surrendered to Parkridge at the expiration of the Lease; required all alterations after the initial buildout, at the election of Parkridge, either to be removed at Lockheed's expense or to remain and be surrendered to Parkridge [the "election"]; and required Lockheed to surrender the premises in as good a condition as when received, excluding reasonable wear and tear and loss not caused by Lockheed.

The leases expired on December 31, 1996, and Lockheed vacated on this day. Parkridge did not make the election required under the 1988 Lease for Lockheed to remove alterations at its expense. Lockheed had made a number of alterations over the years and claims that these alterations did not violate the terms of the leases. Parkridge claims that they did violate the terms of the leases.

Parkridge maintains that Lockheed was uncooperative in allowing Parkridge to determine whether Lockheed was complying with the terms of the leases (e.g., whether alterations conformed to code, etc.) and to determine facts that would allow Parkridge to make an informed election. Lockheed, however, states that Parkridge was seeking information (e.g., built drawings, permits, etc.) which the leases did not require Lockheed to submit to Parkridge and that Parkridge was inquiring into matters regarding "restoration" when the lease only required Lockheed to "repair" any damage that might arise if Parkridge elected for Lockheed to remove alterations. Lockheed made these views known in a March 20, 1996, letter, in which it recognized its obligation to repair in the event of an election. (J.A. at 646.) Parkridge declared Lockheed in default under the lease on May 16, 1996. In June 1996, a representative of Parkridge walked through the facility over a period of two days, but he claims that his access was limited. On July 17, 1996, Lockheed wrote to Parkridge and requested that it inform Lockheed, pursuant to its election, which items it would like Lockheed to remove. Parkridge provided Lockheed on September 25, 1996, with a list of items it was required to "restore." On October 8, 1996, Parkridge wrote Lockheed "that until the matter of restoration at Parkridge Two is resolved between the Landlord and Lockheed Martin, no alterations will be allowed to leave the premises and the premises is to remain in its current condi-

3

tion and entirety." (J.A. at 657.) Lockheed again insisted that it did not have an obligation to "restore" under the lease. Parkridge continued to ask Lockheed to provide it with documentation that work was up to code and under permit, but Lockheed did not provide any documentation.

After Lockheed vacated, Parkridge claims that it had its first opportunity to fully inspect the premises and that it found numerous code violations and instances of poor workmanship. It hired an engineer, who found numerous code violations. Lockheed insists that it vacated the premises in good condition and in accordance with the lease. It points out that Parkridge representatives made no complaint about the condition of the premises on a December 31, 1996, walk-through. Furthermore, Parkridge hired a contractor to demolish the building's interior ceiling, and it was after this demolition that the above-mentioned inspections, which found deficiencies, were made. Lockheed points out that neither the engineer nor the inspectors distinguished between original improvements installed by Parkridge or subsequent improvements installed by Lockheed. Neither did they distinguish between improvements that were up to code when installed (and perhaps grandfathered into compliance) and improvements that were noncompliant at the time of installation.

II.

We review de novo a judgment as a matter of law under Rule 50(a)(1) of the Federal Rules of Civil Procedure. Malone v. Microdyne Corp., 26 F.3d 471, 475 (4th Cir. 1994). The evidence must be viewed in the light most favorable to the non-moving party (Parkridge), and the court neither weighs the evidence nor judges the credibility of the witnesses. Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996). Because we agree with the district court's determination that Parkridge insufficiently proved damages, we find no error in it granting Lockheed judgment as a matter of law.[1]

_____

[1] Additionally, we agree with the district court that Parkridge never elected for Lockheed to remove alterations from the premises at Lockheed's expense. Therefore, Parkridge is precluded from recovering any damages under the election clause of the 1988 Lease.

4

Under Virginia law, a jury may not be allowed to speculate on either the cause or the amount of damages:

> To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted. There can be no recovery where speculation or conjecture must be resorted to in order to determine what caused the damage complained of. When there is evidence of damage from several causes, as to a portion of which a defendant cannot be held liable, the burden is on a plaintiff to present evidence which will show "within a reasonable degree of certainty" the share of damages for which a defendant is responsible.

Hale v. Fawcett, 202 S.E.2d 923, 925 (Va. 1974). The burden of proof is therefore on Parkridge,[2] and "[i]f the proof is too uncertain to allow a jury to apportion the part for which the defendant is responsible, the issue should not be submitted to the jury." Carr v. Citizens Bank & Trust Co., 325 S.E.2d 86, 90 (Va. 1985) (citing Hale, 202 S.E.2d at 925). "The standard of proof required when damage is the result of multiple causes is not absolute certitude but reasonable certainty." Sachs v. Hoffman, 299 S.E.2d 694, 696 (Va. 1983). Because Parkridge failed to show with reasonable certainty the portion of dam-

_____

[2] Parkridge claims that the burden of proof is upon Lockheed to demonstrate that it did not cause the damages. It bases its argument upon Virginia Code § 55-226, which allows a tenant who promises to "leave the premises in good repair" to avoid liability for damage to the leased premises when the tenant proves that it was not negligent. See Warehouse Distribs., Inc. v. Prudential Storage & Van Corp. , 161 S.E.2d 86, 90 (Va. 1968). Section 55-226 is applicable in the instant case because Lockheed promised to surrender the premises "in as good condition as when Tenant took possession." (J.A. at 514.) This promise, however, contained exceptions "for reasonable wear and tear and loss by fire or other casualty not caused by Tenant or its Agents." (Id. (emphasis added).) Therefore, before Lockheed has any burden to prove that it was not negligent in causing the damages, Parkridge must first prove that Lockheed was the one who caused the damages. As a result, section 55-226 does not operate to shift the burden of proof with respect to proving the cause of damages.

5

ages for which Lockheed was responsible, the district court did not err in dismissing the case.

Several cases illustrate how the Hale principle should be applied. In Hale, the Supreme Court of Virginia reversed judgment for the plaintiff because of a failure to prove the cause of damages:

> In Hale v. Fawcett, Blake Fawcett filed an action against Joseph Hale for damages to a corn crop and farmland caused by Hale's trespassing hogs and cattle. Fawcett was only entitled to recover damages caused by the cattle entering his farm through a narrow space between a cattle guard and a gate post. Fawcett was not entitled to recover for damages caused by cattle entering through or over an existing division fence. No evidence was produced which enabled the jury to form a reasonable estimate of that portion of the damage caused by the cattle entering through the narrow opening and the portion of the damage caused by cattle entering through or over the division fence. Thus, we reversed the judgment in favor of Fawcett because he failed to prove with reasonable certainty the share of damages for which Hale could be held liable.

TechDyn Systems Corp. v. Whittaker Corp., 427 S.E.2d 334, 337-38 (Va. 1993) (citing Hale, 202 S.E.2d at 925).

In contrast, the Supreme Court of Virginia upheld the jury's verdict in TechDyn because there was sufficient proof of the cause of damages. The plaintiff proved with sufficient certainty that the defendant subcontractor caused the delay for which damages were awarded. The plaintiff's proof consisted of the subcontractor's admission of responsibility for some of the delay, evidence showing that delays were a result of deficiencies in the subcontractor's work, testimony by the plaintiff's experts attributing delay costs solely and directly to the subcontractor's performance, and testimony by the plaintiff's vice president that the delay was attributable to the subcontractor's non-performance. See id. at 338.

Finally, in Medcom, Inc. v. C. Arthur Weaver Co., 348 S.E.2d 243 (Va. 1986), the court upheld the trial court's determination that evidence of damages was insufficient to create a jury issue:

6

Medcom attempted to prove two other elements of damage: (1) the cost of defective parts removed from concentrator units, and (2) the cost of labor and replacement parts incurred in repairing concentrator units. Medcom's witness testified that the inventory of defective parts amounted to $90,849 and that replacement costs amounted to $19,827.65. The witness, however, conceded that an undetermined amount of the defective inventory and replacement costs was attributable to defective parts acquired from sources other than Weaver and Clippard.

. . . .

Ordinarily, it is the jury's function to determine whether and to what extent a litigant has been damaged. In the present case, however, Medcom's evidence of damages was vague, indefinite, and speculative. We hold, therefore, that the trial court properly struck Medcom's evidence on its counterclaim and third-party claim.

Id. at 247-48.

The instant case is like Hale and Medcom , not TechDyn. Parkridge offered no testimony indicating what damages are attributable to Lockheed versus Parkridge itself. Parkridge based its damage estimates upon inspections which occurred after it demolished the building in early January 1997. Thus, the jury could not have distinguished with reasonable certainty damages caused by Lockheed from damages caused by this demolition.

In addition, Parkridge offered four damage estimates for which it claims Lockheed is directly responsible: One thousand seven hundred dollars in sprinkler repair, per testimony of Scott Titus; $10,800 in correction of code violations, per testimony of Vincent Browning; $85,100 in correction of code violations, per testimony of Timothy Harlow; and $77,185 in ceiling repair costs,[3] per testimony of Gary

_____

[3] Although Parkridge claims that the repair of the ceiling was a "direct cost," see (Br. of Appellant at 36), it actually was Parkridge that

7

Ball. See (Br. of Appellant at 35-36.) Parkridge also claimed that there were consequential damages of $400,000 in additional tenant improvements; $790,000 in lost rent; and $512,000 in carrying charges. See (id.)

Parkridge failed to show that Lockheed caused the specified damages. Mr. Titus conceded that his $1700 estimate did not account for deficiencies caused by Lockheed versus deficiencies caused by Parkridge. See (J.A. at 345-46.) Mr. Browning admitted that he did not know who caused the $10,800 in code violations. See (J.A. at 350.) Mr. Harlow did not differentiate between violations caused by Lockheed versus Parkridge. See (J.A. at 359-60.) All consequential damages -- ceiling repair costs, improvement costs, lost rents, and carrying costs -- are irrelevant because they flow from Parkridge's claim for direct damages, but Parkridge has failed to prove any direct damages. It did not offer proof which would have allowed the jury to apportion between code violations and other deficiencies that were caused by Lockheed and those that were caused by Parkridge either in its initial buildout or in its demolition of the ceiling.

In addition to the causation issue, there also was no proof of actual damages because Parkridge never made the repairs at issue. Instead, the building was substantially gutted by the subsequent tenants in order to accomplish their wholesale remodeling plans. Virginia law states that, in an action for failing to return the premises in the same condition as when delivered, "the measure of plaintiff's damages [is] the reasonable cost of putting the premises in the required state of repair . . . even if the repairs have not been made by the landlord." See Sharlin v. Neighborhood Theatre, Inc., 209 Va. 718, 723 (1969). This court has interpreted Sharlin's principle not to apply when "the cost of restoring the property to its former condition greatly exceed[s] any benefit to the market value of the property." Associated Stations,

_____

destroyed the ceiling. These damages are more accurately characterized as consequential damages. See Richmond Med. Supply Co. v. Clifton, 369 S.E.2d 407, 409 (Va. 1988) (characterizing direct damages as "those which naturally or ordinarily flow from the breach" and consequential damages as those "aris[ing] from the intervention of special circumstances not ordinarily predictable").

8

Inc. v. Cedars Realty & Dev. Corp., 454 F.2d 184, 188 (4th Cir. 1972). In such situations, in order to avoid a windfall that would overcompensate the plaintiff, the appropriate measure of damages is diminution in market value. See id. at 190. In the instant case, restoration costs would represent a windfall to the plaintiff because no restoration was made and because the subsequent tenants substantially demolished the interior of the building. Accordingly, the appropriate measure of recovery is diminution of market value. Because there is no evidence of a diminution in market value, the district court is affirmed on this basis as well.

III.

Several witnesses at trial were not identified as expert witnesses in accordance with the court's pretrial procedure and were not allowed to testify as experts. The district court consequently excluded various parts of their testimony on the basis that it was opinion testimony that could only come in through an expert witness. Parkridge asserts that these rulings were error because the testimony could come in via Rule 701 of the Federal Rules of Evidence, which allows opinion testimony of lay witnesses if the opinion is "rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701.[4]

_____

[4] Parkridge contests several exclusions. First, with respect to Christopher Walker, the court prevented him from testifying (1) how long he thought it would take to make repairs that Parkridge perceived were necessary in December 1996, and (2) what the tenant allowance was on the two leases subsequent to Lockheed's leases. (J.A. at 129, 134-35.) Second, with respect to Clark Rheinstein, the court prevented him from (1) testifying to the tight real estate market at the time Lockheed decided not to renew, and (2) comparing the allowances of the replacement tenants with the allowances given other tenants. (J.A. at 390-91, 393.) Finally, with respect to Charles Poulson, the court prevented him from testifying (1) why the property could not be re-let "as is" at the end of Lockheed's term; (2) that some alterations were made that were not covered by permits; (3) that there were numerous building code violations; and (4) that he estimated a cost of $400,000 to make the required repairs. (J.A. at 183-84, 198, 213, 220-21.)

9

We review the district court's decision for abuse of discretion, granting deference to its decision. <u>General Elec. Co. v. Joiner</u>, 118 S. Ct. 512, 517 (1997). An abuse of the district court's discretion occurs when the court fails to actually exercise its discretion, fails to take into account judicially recognized factors constraining the exercise of its discretion, or relies on erroneous legal or factual premises. <u>See James v. Jacobson</u>, 6 F.3d 233, 239 (4th Cir. 1993).

Parkridge disputes the court's conclusions, but it does not show how they are an abuse of discretion. Although the court could have clarified how the testimony at issue did not meet the standards of Rule 701, we find that any error was harmless in light of the fact that the testimony did not address the essential flaw in Parkridge's case -- that Parkridge did not demonstrate causation with respect to damages. <u>See Renfro Hosiery Mills Co. v. National Cash Register Co.</u>, 552 F.2d 1061, 1070 (4th Cir. 1977) (affirming judgment when possible error in excluding evidence was harmless).

IV.

Finding no error, we affirm.

<u>AFFIRMED</u>

10