# Wytheville

R. L. MASSIE AND W. A. MILLER v. L. H. DUDLEY, EXECUTOR
OF THE WILL OF EASTHAM DEARING.

June 12, 1939.

Record No. 2087.

Present, All the Justices.

The opinion states the case.

*Richards & Richards, C. W. Carter* and *Walter H. Robertson,* for the appellants.

*R. A. McIntyre* and *John K. Hutton,* for the appellee.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers, Special Assistant, amicus curiae.*

SPRATLEY, J., delivered the opinion of the court.

The question for our decision is whether a person who is not licensed as a real estate broker under Virginia Code 1936, chapter 175C, sections 4359(77)–4359(91), inclusive, but who is acting under an express contract to produce a purchaser for certain real estate, for a fixed fee, may recover such compensation for services rendered in connection with negotiations culminating in the sale of that real estate to the purchaser he brings forward.

Eastham Dearing, a wealthy and prominent farmer and a resident of Rappahannock county, Virginia, died August 6, 1936, leaving a large estate. His will was duly probated, and L. H. Dudley qualified as executor.

Dearing, on April 4, 1936, had given an option to the United States of America to purchase, for the sum of $23,-245, his farm in Rappahannock county, Virginia, contain-

ing 450 acres, more or less. The option was accepted in writing pursuant to its terms on June 19, 1936; but Dearing died before a deed was executed to the Government. The executor filed a bill in equity praying for the direction and guidance of the court with respect to the proper distribution of the estate among the residuary legatees, and for authority to execute and deliver a deed of conveyance to the United States of America for the above farm. Authority being given, the land was accordingly conveyed by deed dated June 16, 1937.

The cause was referred to a commissioner in chancery, who was required to take and state all accounts for the distribution of the estate, including all accounts and debts due by it.

R. L. Massie and W. A. Miller filed a claim before the commissioner in chancery for $1,134.75, for services rendered Dearing during his lifetime, in connection with the sale of his farm to the Government. The claim was based upon a verbal contract between Dearing and Massie, in which it was agreed that Massie should be paid for his services 5% of the purchase price of the property.

The executor objected to the allowance of the claim on the ground that neither Massie nor Miller having been licensed to act as real estate brokers during the time their services were performed, the contract was illegal and void, and no recovery could be had thereon. To the report of the commissioner allowing the claim, the executor excepted. The trial court set aside the finding of the commissioner. To the action of the trial court, this appeal has been allowed.

The record discloses the following uncontradicted facts:

R. L. Massie is and has been for several years commissioner of revenue for Rappahannock county. He had formerly been engaged in the real estate business, for which he had then taken out a real estate broker's license. He secured no such license after 1933, and hence had none during the period in which the negotiations hereinafter described were conducted.

Massie says that Dearing, whom he knew very well, approached him probably in 1927 or 1928, and made to him a proposition,—that if he would bring him a "customer" to whom a sale of his farm could be effected, he would pay him 5% of the sale price. There was no written contract.

Massie gives his version of his agreement and undertaking with Dearing in the following language:

"A. I had an understanding with Mr. Dearing for about 8 years in regard to the sale of the farm or the sale of the farm at Flint Hill to the Government or to anybody else.

"Q. What was the understanding?

"A. That if I brought him a customer and he effected sale of the farm he would pay me 5% on the sale price."

It further appears that early in 1934, Miller, who had been a census taker in the Shenandoah Park Area, and who is now a postmaster in Rappahannock county, told Massie that the United States Government contemplated the purchase of some land in Rappahannock county for the Shenandoah Home Project Re-Settlement Administration. Massie immediately thought of the Dearing farm, and in return for the suggestion from Miller, agreed to give the latter one-half of any commission he should receive for effecting the sale of Dearing's farm to the Government.

Miller, who did not testify, did little or nothing towards making the sale, and his connection therewith was unknown to Dearing.

Massie promptly wrote a letter to Mr. Zerkle, the project manager of the Re-Settlement Administration, calling his attention to the availability of the Dearing farm. Dearing gave to the Government its first option for the farm in August, 1934. This was also the first time a price for the farm was stated. Several other options followed, the last being given on April 4, 1936. Massie also secured an option for the Government on his mother's farm, which adjoins that of Dearing. The Government considered both farms necessary to form a sufficient unit of acreage for its purposes, and purchased both at the same time.

Dearing was a man of advanced age, and although possessed of a large and valuable estate, had no office, no telephone, and no automobile. He largely relied upon Massie for aid and advice, especially in connection with the transaction under review.

Massie, after his letter to Zerkle and the first option given by Dearing, kept in touch with the transaction all the time, doing what he could to advance the sale of Dearing's farm. He wrote a number of letters; had frequent conferences with Dearing and with representatives of the Government, jointly and severally; took Dearing to Zerkle's office in Luray; took agents of the Re-Settlement Administration over the farm, showing them the lines; worked several days with the appraisers of the farm; and used his own automobile in making such trips, carrying both Dearing and the Government's representatives with him.

There is no denial of the time and effort which Massie claims he spent towards effecting the sale and working with both parties towards that end.

The Government was favorable towards the purchase of Dearing's farm, but had difficulty in securing what it considered a satisfactory price.

Massie and Miller do not undertake to itemize the various expenditures on their part, or the value of their respective services; they merely seek to recover a flat fee of 5% of the purchase price. They introduced evidence that a real estate broker's commission is usually 5% under similar circumstances.

Massie recalls only two conversations with Dearing during the negotiations with the Government, with reference to his compensation,—one when he first dealt with the Government, and the other when the option was executed. He says that at Dearing's request, he agreed to deduct all costs of the transfer of the property from the amount upon which the compensation was based, because the option stipulated that the seller should pay the costs of recording the deed, etc. He further says that if he had thought he was not to

recover the compensation agreed upon for his services, he would not have taken any interest in the sale of the land.

The plaintiffs in error contend that the performance of the services they rendered to Dearing are not covered in the Real Estate Brokers' Act, chapter 175C, under which a license is required; that if the contract for such services be in violation of the statute, it is not such an illegality as precludes a recovery for the services rendered; and that if the statute is intended to cover such services, it is invalid and void, being in contravention of the Constitution of the United States as impairing the obligation of a contract and denying due process of law. U. S. C. A. Const., art. 1, section 10; Amend. 14.

So much of the Act as is material and pertinent in this case may be set out as follows:

The first section, 4359 (77), provides:

"On and after January 1, 1925, it shall be unlawful for any person, copartnership, association or corporation to act as a real estate broker or real estate salesman, or to advertise or assume to act as such real estate broker or real estate saleman, without a license."

The next section, 4359 (78), defines in clear terms what constitutes a real estate broker within the meaning of the Act:

"A real estate broker within the meaning of this act is any person, * * * who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or who leases or offers to lease, or rents or offers to rent, any real estate or the improvements thereon for others, as a whole or partial vocation. * * * One act for a compensation * * * shall constitute the person, * * * a real estate broker or real estate salesman within the meaning of this act."

Section 4359 (81) specifies the requirements for obtaining a license.

The twelfth section, 4359 (88), provides a penalty by fine and imprisonment, or both, for a violation of any of the provisions of the Act.

While Massie bases his claim upon his contract to furnish Dearing a customer for the land,—a customer ready, willing and able to pay the price demanded by the owner, he contends that since he did not fix the price, nor make the sale himself, he was not a broker. By some distinction, which we are unable to follow, he further argues that such services as he rendered are not covered by the word "negotiate."

While it is true he had no authority to fix the price of the property and could not, therefore, make or submit a binding offer, he was nevertheless a broker with a qualified or limited authority. He was authorized to secure a purchaser and to obtain and negotiate offers for the property, subject to the approval of the owner. Once an agreement was reached, his services were at an end. The terms of the sale and the price to be paid were the primary concerns of the parties to the agreement. The price was material only to the measure of compensation.

Webster's New International Dictionary (2d Ed.), defines the word "negotiate": "To hold intercourse or treat with a view to coming to terms upon some matter, as a purchase or sale, a treaty, etc.; to conduct communications or conferences as a basis of agreement; as to *negotiate* for the purchase of a house."

Massie initiated, induced, brought about, arranged, and conducted the communications and conferences between the parties for the purpose of arranging a mutual agreement between them respecting the sale of the farm. In pursuance of his contract, he produced a purchaser for the farm, and pointed out its adaptability and advantages for the purposes desired by the prospective purchaser. He kept the parties in contact; he smoothed out the differences between them, and built up their minds towards the sale agreement. He was the linchpin which kept the progress of the negotiations from breaking off. We find it difficult to im-

agine any set of circumstances more completely constituting the elements of negotiation.

In *Grammer* v. *Skagit Valley Lumber Company* (1931), 162 Wash. 677, 299 P. 376, 378, 380, it was said:

" * * * A broker negotiates just as much when he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure, as when he himself carries on the discussion and personally induces an agreement to accept a specific provision."

Massie's own testimony proves him squarely within the provisions of the Act.

There is little need for judicial construction of the Virginia statute. Its provisions and purposes are equally apparent. The acts prohibited are termed unlawful, and punishment is provided upon conviction for a single act of violation.

In this State, we have followed the general rule that a contract made in violation of a statute is void, and there can be no recovery thereon, unless it is apparent from the statute that the legislature did not intend to make the contract void and unenforceable, but simply to leave those violating its provisions amenable to its penalties.

We find nothing in the language of the statute, or the subject matter of the regulation, which indicates the slightest intention to treat the contract as valid and enforceable between the parties, and simply to provide for the exaction of a penalty. There is nothing by which we can presume that it was intended that a violator should escape the ordinary consequences of his illegal acts.

The agreement upon which the plaintiffs in error rely is illegal, not merely invalid. It is void as being contrary to a positive statute and to public policy. Not merely the mode of its performance, but its substance is unlawful. The imposition of the penalty emphasizes the illegality.

In *Levy* v. *Davis,* 115 Va. 814, 80 S. E. 791, 792, we refused to enforce an agreement for the sale of furniture, known by the seller to be intended for illegal or immoral

purposes, either by allowing the seller to recover the agreed purchase price or to reclaim the furniture.

Judge Whittle, quoting with approval from 2 Elliott on Contracts, section 1064, said:

"It is a well settled principle of law that the courts will not aid a party to enforce an agreement made in furtherance of objects forbidden by the statutes, or by common law, or general policy of law, or to recover damages for its breach, or when the agreement has been executed in whole or in part by payment of money, to recover it back. * * * The law refuses to enforce illegal contracts, as a rule, not out of regard for the party objecting, nor for any wish to protect his interests, but from reasons of public policy. Whenever, therefore, the illegality of the contract appears, whether alleged in the proceedings or made known for the first time in the evidence, it is fatal to the case. * * * The law will not enforce contracts founded in its violation."

In *Roller* v. *Murray*, 112 Va. 780, 72 S. E. 665, 666, 38 L. R. A. (N. S.) 1202, Ann. Cas. 1918B, 1088, it was held that a lawyer could not recover upon a champertous contract, nor upon a *quantum meruit* for services rendered under such contract, because the contract was unlawful.

Judge Buchanan, speaking for the court, said: "Where the contract is illegal because contrary to positive law or against public policy, an action cannot be maintained either to enforce it directly or to recover the value of services rendered under it, or money paid on it."

In 8 American Jurisprudence, section 154, under the title of "Brokers," the general principle is stated as follows:

"If the object of the statute is to protect the public by insuring the honesty and good behavior of brokers, that is, if it is a police regulation, there can be no recovery if a license has not been procured prior to the rendition of the services sued for. Thus, if the act is prohibitory and renders unlawful transactions by unlicensed brokers, there can be no recovery. There are a number of decisions to the effect that an unlicensed broker cannot recover for his services under a license law which imposes a penalty for the

breach thereof, for the reason that the imposition of the penalty implies a prohibition even in the absence of prohibitory words in the statute."

In 6 Williston on Contracts, Revised Edition, page 5008, it is said:

"Where a statute requires a broker to obtain a license before sales of the kind in question can be negotiated by him, there is no doubt that if such a sale is made by one acting as a broker without the required license, he can recover no compensation for his services in spite of the fact that the license has been secured before the commissions become due."

In general, it seems to be well established that where a licensing statute is a police regulation, having for its object the protection of the public, making it unlawful for a person to engage in a business without a license, and imposing a penalty for its violation, a contract made by an unlicensed person is void and unenforceable. 37 C. J. 259, *et seq.*

In *Miller* v. *Ammon*, 145 U. S. 421, 12 S. Ct. 884, 886, 36 L. Ed. 759, it was held that a sale made in violation of a city ordinance created no right of action which a court would enforce. The court there said:

"The general rule of law is, that a contract made in violation of a statute is void; and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract he cannot recover. * * * There can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal. * * * When the statute is silent and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void. * * * By the ordinance, a sale without a license is prohibited under penalty. There is in its language nothing which indicates an intent to limit its scope to the exaction of a penalty, or to grant that a sale may be lawful as between the parties, though unlawful as against its prohibition; * * * "

The Supreme Court of the United States again in *Waskey* v. *Hammer,* 223 U. S. 85, 32 S. Ct. 187, 56 L. Ed. 359, after citing with approval *Miller* v. *Ammon, supra,* said that where an act is expressly prohibited under penalty, and there is nothing in the language of the statute indicating that the scope of the prohibition is to be confined to the penalty, or that the acts done in violation of the statute are to be held valid, no right is conferred on the wrongdoer.

An exception to the general rule was applied by this court in *Watters and Martin* v. *Homes Corporation,* 136 Va. 114, 116 S. E. 366. There it was thought that one of the sections of the so-called "Blue Sky Laws," then under review, evidenced the intent of the legislature to make the contract in question enforceable. The General Assembly, after that opinion was rendered, amended the "Blue Sky Laws," by providing that every sale or contract made in violation thereof should be voidable at the election of the purchaser of the security sold. Virginia Code 1936, section 3848 (61).

We do not think that the provision contained in section 4359 (88) of the Virginia statute, "This law shall not be construed to release any person from civil liability or criminal prosecution under the general laws of this State," indicates any intention to exempt an act made unlawful thereunder from the general rule applying to the enforcement of illegal contracts. Construing this provision, and giving it a reasonable interpretation consistent with the language employed and the purposes of the entire Act, it obviously means that no person licensed under it shall be released from liability, if he be guilty of fraud or false misrepresentation while acting as a broker or salesman, or from a criminal prosecution when an added license, required under an ordinance of a city or some other general law, is not procured.

The provision for release of liability certainly was not intended to apply to some one not licensed by the Act. Its very language confines the expression to the effect of the provisions of the Act. It must necessarily refer to those who secure a license thereunder, and its purpose is to make

clear that the granting of the license confers upon the recipient no right to violate either the civil or criminal laws.

Statutes regulating the real estate business, and requiring brokers and salesmen to procure a license before acting as such, have been enacted in many States. They have the same general purpose and are designed to protect the public from the fraud, misrepresentation and imposition of dishonest and incompetent persons. The reasons are not hard to see. The relations of trust and confidence which lie in the very nature of the business require that honesty and a fair amount of intelligence be exercised by those engaged in its pursuit. The records of the courts disclose far too many instances of litigation arising from unrestricted and unregulated agencies in this field. The regulation is an exercise of the police power, and not merely a revenue measure.

Acts similar to the Virginia statute have been attacked in several States upon the ground of constitutionality. 8 A. L. R., note page 424; 50 A. L. R., note page 1334.

In *Roman* v. *Lobe* (1926), 243 N. Y. 51, 152 N. E. 461, 50 A. L. R. 1329, a statute similar to the Virginia Act was under attack. Mr. Justice Cardozo, in rendering the opinion, held that it was a valid exercise of the police power, and not in violation of the Federal Constitution. He listed the enactment of like statutes in many other States, including Virginia, and cited cases from many State and Federal courts upholding their validity. Referring to *Bratton* v. *Chandler*, 260 U. S. 110, 43 S. Ct. 43, 67 L. Ed. 157, where a statute of Tennessee, almost identical with that of Virginia, was held not to be in violation of the Fourteenth Amendment to the Federal Constitution, he said, "By dictum and manifest implication, if not by necessary decision, the statute was sustained." [243 N. Y. 51, 152 N. E. 463.]

The Supreme Court of California has upheld the constitutionality of the statute adopted in that State. *Riley* v. *Chambers,* 181 Cal. 589, 185 P. 855, 8 A. L. R. 418; *Haas* v.

*Greenwald* (1925), 196 Cal. 236, 237 P. 38, 59 A. L. R. 1493, 1495.

We find no error in the ruling of the trial court. Its decree is affirmed.

*Affirmed.*