**Richmond**

A. CHARLES SACHS

V.

GERALD HOFFMAN AND CARMAN HOFFMAN

January 21, 1983.

Record No. 800722.

Present: All the Justices.

546

*Alan G. Fleischer (Hirschler, Fleischer, Weinberg, Cox & Allen*, on briefs), for appellant.

*M. Pierce Rucker (Douglas P. Rucker, Jr.; Sands, Anderson, Marks & Miller*, on brief), for appellees.

PER CURIAM.

The principal issue on this appeal is whether the trial court erred in overruling the defendant's motion to strike the plaintiffs' evidence of rental losses, part of the damages claimed by Gerald and Carman Hoffman against A. Charles Sachs in a suit sounding in tort.

The Hoffman brothers operated Hoffman's Lunches, Inc., a food-processing and mobile-catering service. The corporation conducted its business in a building, leased from the brothers, which was specially designed, constructed, and equipped for such an enterprise. The corporation was declared bankrupt in August 1975, and the trustee obtained an appraisal of the corporate assets subject to sale.

After the business closed, Carman went to work for Sachs, president of Pizza Inns of Virginia, Inc. Carman informed Sachs about the sale and suggested that some of the assets of the estate might be useful in the pizza restaurants. Sachs, Carman, and the trustee walked through the Hoffmans' building and, with the aid of flashlights, inspected the furniture and equipment. Sachs made an offer of $9,000, and the bankruptcy court entered an order confirming the sale of the equipment listed on the trustee's schedule. The trustee testified that "I only sold the property which was on this list". Sachs testified that there "was supposed to be a list" but that he "never referred to the list" because "Carman just would always say, everything goes", and would explain that "we just want to get everything out and get [the building] cleaned up and rent it or sell it."

Finding that he could not use all the equipment, Sachs decided to hold an auction on the premises. A few days before the auction was scheduled, Gerald saw two of Sachs' employees on the roof of the building, preparing to disconnect the exhaust fans. He told the men that "your boss has a list of what he bought" and instructed them to "leave all the rest of the property in place." Ignoring Gerald's objections, Sachs dismantled five exhaust fans and hoods, seven large refrigeration compressors, and certain accessory equipment attached to the building. These items and a refrigerated truck body, none of which was included in the trustee's schedule

of assets, were sold at the June 5, 1976 auction or otherwise disposed of. After deducting the auctioneers' commissions, Sachs kept the proceeds.

The Hoffmans filed a motion for judgment seeking damages for unlawful conversion. They also alleged that the building had been damaged when the equipment was removed and, as a result, they had been unable to lease the property. Accordingly, they claimed damages for loss of rent for a period of nearly three years. In support of that claim, the Hoffmans called as their expert witness Joseph J. Harding, III, a real estate agent specializing in commercial properties.

Harding testified that, in the early spring of 1976, the Hoffmans had engaged him to sell or lease their building. Harding inspected the property, which he described as "a special-use kind of building". He found normal wear and tear but no structural damage and considered the building "a good prospect for renting . . . at its highest and best use". Because the building contained extra plumbing and electrical apparatus, terrazzo floors, tile, and floor drains, he began "looking for something that could utilize" those features, such as a "chemical lab or other type of food processor". He believed the fair rental value was $2.00 per square foot of floor space, or $16,000 per year.

On a rainy day following the June auction sale, Harding visited the building again. He found holes in the roof where the ducts leading to the fans and compressors had been removed and "water just collected on the floor." The Hoffmans hired contractors to fix the roof, but the repairs proved ineffective. Although Harding conducted an extensive advertising campaign by telephone, newspaper, and mass mailings, he was unable to lease the property, and following the auction in 1976, the building remained vacant until March 1979.

The Hoffmans called witnesses to prove the value of the equipment they alleged Sachs had converted, the cost of installation of that equipment, and the cost of plumbing, electrical, and roofing repairs. The estimates totalled something more than $22,000. Overruling Sachs' motion to strike Harding's testimony, the trial court instructed the jury on the question of damages for rental losses, as well as the other losses alleged. The jury awarded the Hoffmans $40,000 in damages, and the trial court entered judgment on the verdict.

On appeal, Sachs argues that Harding's testimony is insufficient to support an award of damages for rental losses. Sachs points to Harding's reply when he was asked if he was "aware of . . . any objectively ascertainable reason or cause for why the building did not lease readily after the auction":

Well, it was just a combination of factors: The building condition itself and, I think also maybe the market conditions. We didn't have the right — couldn't find the right person.

Reaffirming this testimony on cross-examination, Harding explained that "you don't know whether someone who was looking at the building did not come back because of the physical condition of the building or else he may have found another building that suited his needs a lot better."

As Sachs interprets this testimony, the rental loss was the result of different but interdependent causes. In such case, he says, a plaintiff is not entitled to any recovery unless he proves the amount of damages attributable to each cause. He relies on *Hale v. Fawcett*, 214 Va. 583, 202 S.E.2d 923 (1974), and *Barnes v. Quarries, Inc.*, 204 Va. 414, 132 S.E.2d 395 (1963). Sachs misconceives the rationale in those cases. In both, our decisions were based upon the plaintiff's failure to produce evidence sufficient to establish specific causal connection between the defendant's conduct and the damage alleged. Here, Harding's testimony expressly identified the damage Sachs did to the building as a proximate cause of the loss of rentals. *See Pebble Bldg. Co. v. Hopkins, Inc.*, 223 Va. 188, 288 S.E.2d 437 (1982).

But, Sachs argues, even if the evidence was sufficient to show that he was responsible for part of the loss, it was insufficient to enable a jury to determine the portion attributable to the condition of the building. This argument raises the pivotal issue.

The standard of proof required when damage is the result of multiple causes is not absolute certitude but reasonable certainty. In *Smith v. The Pittston Company*, 203 Va. 711, 127 S.E.2d 79 (1962), Smith alleged that his property had been damaged by contaminants emitted from Pittston's smokestacks. Smoke from another plant operated by Appalachian Power Company also drifted across Smith's property. At Pittston's request, the trial court granted Instruction No. 4, which "told the jury that if they

believed the damages claimed by plaintiff 'were caused in part by the defendant and in part by the Appalachian Power Company, or any other source, and if the evidence fails to show the part or amount of damages caused by defendant, then you cannot find against the defendant in this case.' " *Id.* at 715, 127 S.E.2d at 82. Holding that the trial court erred, *inter alia*, in granting that instruction, we reversed a judgment for Pittston and remanded the case for a new trial.

Discussing this error, we said:

> It is true that where damages are occasioned by a combination of causes originating from different sources, it is for the jury to determine from the evidence what part is attributable to a defendant and what part to other persons or other causes. The burden is on a plaintiff to produce evidence which will show 'within a reasonable degree of certainty' the share of the defendant therein.
>
> The vice in Instruction No. 4 is that it put the burden on the plaintiff to prove the exact amount of damages caused by the defendant under the circumstances mentioned, when absolute certainty in such case is not attainable and is not required.

*Id.* (citations omitted); *see also Nat. Energy Corp.* v. *O'Quinn*, 223 Va. 83, 286 S.E.2d 181 (1982).

 In all relevant particulars, *Smith* parallels this case. Like Pittston, Sachs was responsible for only one of the apparent causes of the damage suffered. Here, as in *Smith*, absolute certainty was not attainable because it was impossible to establish a table of ratios of cause and effect by which liability could be ratably allocated with categorical verity. And, just as Smith was not required to bear an impossible burden of proof, the Hoffmans were not. While the trial judge initially questioned the import of Harding's testimony, he approved an instruction on damages to which no error is assigned. The judge told the jury that the standard of proof was reasonable certainty, and he explained that this standard applies when "the damages complained of . . . may have resulted from either of two causes, for one of which the defendant may have been responsible and for the other of which he was not".

The quantum of the verdict indicates that the jurors understood and followed that instruction. Evidence of losses other than the

loss of rentals supports more than half the $40,000 the jury awarded. The total rental loss, based upon Harding's uncontradicted evaluation of $16,000 per annum, was nearly $48,000. The reasonable inference is that the jury weighed all the causative factors mentioned by Harding and concluded that only a portion of the total loss was fairly attributable to the cause for which Sachs was responsible.

We cannot say as a matter of law that the evidence was insufficient to enable the jury to allocate liability for the rental loss with a reasonable degree of certainty, and we uphold the trial court's ruling against Sachs' motion to strike Harding's testimony.

In a second challenge to the damage award, Sachs contends that the Hoffmans "were estopped to deny defendant's right to sell the items of personal property plaintiffs claim belonged to them" and that the trial court erred in refusing his instruction on that theory of the case.

In support of this assignment of error, Sachs summarizes his own testimony and that of his employees. Before Sachs bought the bankrupt estate, Carman told him that "everything goes". Carman agreed that Sachs could conduct an auction sale of the equipment he could not use. Carman attended the auction, consulted with Sachs and the auctioneers, raised no objection to the sale of any of the items in question, and specifically authorized Sachs to sell a refrigerated truck body which was not listed on the trustee's schedule of assets.

Sachs' summary overlooks much of the evidence. The only equipment Sachs bought from the trustee was the equipment listed on the schedule which the bankruptcy court incorporated in its order confirming the sale. Sachs had more than constructive knowledge of that schedule. He conceded at trial that he knew it existed, and Gerald sent him notice several days before the auction that the fixtures attached to the building were not on the list of equipment he had bought. Carman also informed Sachs of Gerald's objections and told him that he did not want "to get involved" in any dispute over the equipment because he "had a brother on one side and a boss on the other." Carman testified that he never authorized anyone to remove the fixtures on the roof or those in the walls. He acknowledged that he had authorized Sachs to sell the refrigerated truck body, but he explained that "I was under the impression that it was my property, he was going to

sell it for me" and that when Sachs "got the money from the auctioneer, we would receive the money."

Sachs' estoppel theory rests upon his argument that Carman had led him to believe that he was authorized to sell all the property located in and attached to the building; that he had reasonably relied upon that authority to his detriment; and hence, that he was not liable for any of the damages claimed. This argument is fatally defective.

At Sachs' request, the trial court granted another instruction which told the jury that the Hoffmans could not recover unless they proved "by a preponderance of the evidence that equipment belonging to the plaintiffs was taken and sold without authority". This instruction was fully sufficient to permit Sachs to argue the question of authority, the principal element of his theory of the case. And we believe the trial court was correct in refusing to instruct the jury on the other elements of the equitable doctrine of estoppel.

Sachs does not say what detriment he suffered as the result of Carman's conduct, and we conceive of none. Nor does he explain how his reliance was reasonable when he does not deny that one of the two owners of the equipment had expressly forbidden him to detach it from the building. The evidence was not sufficient to support the estoppel instruction Sachs offered, and we find no merit in this assignment of error.

Accordingly, we will affirm the judgment.

*Affirmed.*