## STEPHEN S. MURRAY, ETC., ET AL.

### V.

## MOHAMED A. HADID, ET AL.

Record No. 880883

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Thomas*, Whiting, and Lacy, JJ., and Poff, Senior Justice

* Justice Thomas participated in the hearing and decision of this case prior to the effective date of his resignation, November 1, 1989.

*Aubrey M. Daniel, III (Carolyn H. Williams; Williams & Connolly*, on briefs), for appellants.

*Mark London (Harvey Cohen; Barbara K. Dougherty; Cohen, Gettings, Alper & Dunham; Laxalt, Washington, Perito & Dubuc*, on brief), for appellees.

Justice Lacy delivered the opinion of the Court.

In this appeal we review the trial court's decision to set aside a jury verdict in favor of the appellants, Stephen S. Murray, Mary P. Murray, and McLean Builders and Developers (the Murrays), in an action for fraud against Mohamed A. Hadid and Hadid Investment Group, Inc. (Hadid). The jury found for the Murrays and awarded them $984,000 compensatory damages and $1 million punitive damages.

In setting aside the verdict, the trial court ruled that the Murrays could not recover damages for Hadid's fraud. The trial court issued three alternative findings to support its ruling: (1) the Murrays acted illegally; (2) they did not prove any damages proximately caused by the fraud; and (3) their claimed damages in the form of lost profits were speculative. The Murrays assigned error to each of the trial court's findings and to its denial of the punitive damage award. Additionally, the Murrays assigned error to the trial court's ruling, issued more than twenty-one days after entry of final judgment, that it no longer had jurisdiction over their motion for sanctions against Hadid for discovery abuse.

Under well-established principles, because the Murrays received a favorable jury verdict, we view the evidence in the light most favorable to them.

In the mid-1970s, Mr. and Mrs. Murray became interested in a certain 12.9517 acre tract of undeveloped land located in Mc-Lean. The Murrays thought the property "was absolutely the best available" for the purpose of developing a townhouse project. Although they had never built townhouses, the Murrays were experienced in building large custom-designed houses. During the six years following Mr. Murray's retirement from the armed forces, his company, McLean Builders and Developers, had built ten such homes.

In 1978, the Murrays contacted James Roper, the owner of the property, to express interest in the parcel. Roper declined to sell, explaining that the estate from which he had received the property had not been settled. In July of the following year, the Murrays submitted a co-development proposal to Roper. The Murrays would perform all development responsibilities and Roper would be reimbursed for the property in piecemeal fashion, including a percentage of the profits derived from each sale. Again, Roper rejected the proposal. Nevertheless, the parties formed a close relationship and frequently discussed the future of the property.

In 1982, Roper was prepared to sell the land outright for $4.5 million. The Murrays, after deciding that they were interested more in the building and developing aspects of the project, set out to locate investors in order to meet Roper's asking price. They prepared a prospectus to submit to potential investors which included their plan to build 88 townhouses, selling for $300,000 each, with a projected net profit of $8.8 million on the project.

The Murrays were largely unsuccessful in finding investors until October 1983, when Kamal Taki, for whom the Murrays had built a house, introduced them to Mohamed Anwar Hadid. Hadid, the sole shareholder of Hadid Investment Group, Inc., became very interested in the property after he, Taki, and Mr. Murray visited the site. At that time Hadid asked the others what each wanted out of the project. Taki responded that he wanted a 10% interest, and Murray said he wanted to be the builder. The parties never entered a written agreement with regard to the project. On October 13, 1983, Hadid, through the Murrays, offered Roper $3.5 million for the property. Although Roper rejected the

offer, the evidence showed the Murrays gained confidence in Hadid because he appeared committed to the project.

Other developers were interested in Roper's property as well. On October 20, 1983, one developer, Rocky Gorge Communities, Inc. (Rocky Gorge), offered Roper $4.1 million for the property. Following negotiations, Roper decided that he would accept the contract offered by Rocky Gorge at noon on November 11, 1983.

As a consequence of their close relationship with Roper, the Murrays kept Hadid informed of Roper's negotiations with Rocky Gorge. On November 2, 1983, Hadid offered Roper $4 million for the property. Five days later, independent of the Murrays, Hadid met with Roper's attorney to discuss the offer. Roper, however, did not accept it.

Hadid then turned to the Murrays in an attempt to arrange a meeting with Roper. On November 10, 1983, the Murrays, accompanied by Roper, met with Hadid at his home to further negotiate the offer. As a preliminary matter, Mrs. Murray asked Hadid for a written contract evidencing their agreement that the Murrays would be the builders and developers of the project. Hadid, however, assured her that a written agreement was not necessary since he had made "much bigger deals like this on just a handshake."

The meeting, nevertheless, ended without a contract on the property. Roper and Hadid could agree on neither the price nor the method of payment. Because the deal with Hadid seemed certain to fall through and the Rocky Gorge deal was to be executed the following day, Mrs. Murray decided she and her husband would match Rocky Gorge's offer without consulting Hadid. Mrs. Murray felt certain Roper would prefer to deal with her and her husband rather than with Rocky Gorge, since they had become friends and had frequently discussed the Murrays' plans for the property.

Unquestionably, the Murrays had the financial ability to meet Roper's requirements. However, on the morning of November 11, before Mrs. Murray communicated her intentions to Roper, Hadid contacted her and said that he was prepared to meet the Rocky Gorge offer. Hadid wanted the Murrays to relay the offer to Roper before noon. When Mrs. Murray again inquired about a written agreement, she was assured that she and her husband would build the townhouses and develop the property. Mrs. Murray communicated Hadid's new offer to Roper. Hadid and Roper

met that morning and signed a contract wherein Roper agreed to sell the land to Hadid Investment Group, Inc. for $4.1 million.

Despite the Murrays' pivotal role in the negotiations and Hadid's repeated assurances that they would be the builders and developers of the project, Hadid began negotiations with other builders immediately after the contract was signed. Hadid instructed his employees to ignore the Murrays because "he would try to jerk Mr. Murray around for a while." Hadid purposefully refused to answer the Murrays' inquiries until February 13, 1984, when he wrote Mr. Murray. Hadid explained that if Mr. Murray wanted to develop the Roper property, he should contact Walter M. Cheatle, vice-president of Hadid Investment Group, Inc., and provide Cheatle with his credentials and capabilities.

Mr. Murray met with Cheatle on two occasions, March 2, and April 4, 1984. However, no agreement was reached. Mr. Murray was instructed simply to submit a fixed-price bid. On May 1, 1984, Mr. Murray asked for the documents necessary to comply with Cheatle's request. He received nothing and never was contacted again by Hadid or his company.

During this same time period, Hadid performed engineering on the property, produced site plans, and had the property rezoned. He also negotiated with a number of builders interested in developing the property. On July 27, 1984, Hadid assigned the contract to purchase the Roper property to McLean American Properties Limited Partnership (the Partnership) for $984,000. The Partnership consisted of John G. Georgelas and Sons, Inc. (Georgelas and Sons), Hadid, and Cheatle as limited partners, and Anthony John Georgelas as the general partner. Hadid's and Cheatle's interests in the partnership were 15% and 10%, respectively.

During the summer of 1986, NV Classic Homes, a builder/developer, approached the Partnership and sought to purchase a portion of the Roper property. The Partnership sold NV Classic Homes 67 improved townhouse lots, approximately half of the Roper property, for $100,000 apiece, or $6.7 million total, with profits estimated at $7,000 per lot. Subsequently, Georgelas and Sons, who had been retained by the Partnership to build and develop the project, erected townhouses on the remaining property.

On January 20, 1987, the Murrays filed a motion for judgment against Hadid in the Circuit Court of Fairfax County, seeking $5 million plus 10% of Hadid's profits in compensatory damages, and $10 million in punitive damages. The Murrays proceeded

under two theories: (1) *quantum meruit*, under which they argued that Hadid deprived them of the fruits of their labor and, therefore, he was unjustly enriched at their expense; and (2) fraud, under which they argued, *inter alia*, that, but for Hadid's fraud, they would have purchased the property from Roper and developed it themselves.

Hadid answered with a motion for summary judgment alleging: (1) the Murrays acted illegally in contravention of the real estate brokers licensing statutes and, therefore, could not recover for their illegal acts; (2) Hadid's alleged fraud did not proximately cause the Murrays any damage; and (3) the Murrays' alleged lost business opportunity was too speculative to allow recovery. On March 1, 1987, the trial court heard argument on the motion for summary judgment and ruled that the Murrays could not recover under the *quantum meruit* claim because they had acted illegally under Code §§ 54.1-2100 through 54.1-2120. On the fraud claim, however, the trial court denied Hadid summary judgment because the Murrays claimed that, but for Hadid's fraud, they would have purchased the Roper property. Such a claim, the trial court ruled, was not affected by the Murrays' illegal brokerage activity.

The trial on the Murrays' fraud claim commenced on March 14, 1988. During trial, the Murrays based their $5 million claim on lost profits and what they termed reliance damages, which they argued were equal to Hadid's profits. The Murrays claimed that, but for Hadid's fraud, they would have acquired the contract on the Roper property. Therefore, they asserted that their damages could be identified with subsequent transactions involving the property. The trial court, however, only allowed evidence regarding Hadid's profits from such transactions, excluding all evidence of profits derived by others involved with the property.

At the conclusion of the Murrays' evidence, Hadid made a motion to strike, which the trial court implicitly denied when it took the motion under advisement and submitted the case to the jury. The jury was instructed that if it found by clear, cogent, and convincing evidence that the Murrays were damaged, then the Murrays were "entitled to recover as damages all of the [losses] they sustain[ed] including gains prevented which [were] a direct and natural result of the fraud. . . ."

The jury returned a verdict in favor of the Murrays, awarding them $984,000 in compensatory damages and $1 million in puni-

tive damages. Hadid then filed a motion to set aside the jury verdict. The trial court granted Hadid's motion on May 4, 1988.

On May 26, 1988, the trial court heard the Murrays' motion for sanctions against Hadid for discovery abuse. The trial court determined that it no longer had jurisdiction over the case because more than twenty-one days had elapsed since final judgment for Hadid was entered. Thus, on June 9, 1988, the trial court denied the Murrays' motion for sanctions.

## I. *ILLEGAL ACTIONS*

The Murrays contend that the trial court erred in ruling that they could not recover damages under their fraud claim because they acted illegally. In granting Hadid's motion for summary judgment on the *quantum meruit* claim, the trial court ruled that the Murrays had acted illegally as unlicensed real estate brokers in negotiating the sale of the Roper property for the valuable consideration of becoming the builders of the townhouses. Because neither of the Murrays had a real estate broker's license, the trial court correctly ruled that they had acted illegally and, therefore, could not recover for those illegal services. *See Massie v. Dudley*, 173 Va. 42, 3 S.E.2d 176 (1939). This ruling was not challenged, nor did the Murrays assign error to it in this appeal. Thus, the ruling became the law of the case and the Murrays cannot now complain that they did not act illegally in negotiating the sale. Rule 5:25.

The trial court, nevertheless, erred in supporting its order to set aside the jury verdict on the fraud claim with its prior ruling regarding illegality. In their *quantum meruit* claim, the Murrays alleged that Hadid owed them for services they had performed in obtaining the contract for him. However, in their action for fraud, the Murrays did not rely on their illegal activity as a basis for their damage claim. They did not allege, as the trial court's ruling would indicate, that due to Hadid's misrepresentations they were not compensated for their efforts in obtaining the contract for Hadid. They merely alleged that, but for Hadid's fraud, they would have bought the property themselves and they therefore sought reliance damages. While the trial court's first finding is erroneous, we must examine the court's other bases for denying recovery.

## II. *DAMAGES*

■ The jury found, and the trial court admitted, that the Murrays relied to their detriment on Hadid's material misrepresentations when they surrendered the opportunity to buy the Roper tract based on Hadid's assurances that they would become the builders of the project. But in order to recover under a cause of action for fraud, a plaintiff must prove damages which are caused by his detrimental reliance on a defendant's material misrepresentation. *Winn* v. *Aleda Const. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984).

### A. *Proximate Cause*

The trial court ruled that the damages awarded by the jury were not proximately caused by Hadid's fraud. At trial, it limited the evidence to Hadid's profits or what it termed "fraud damages." It allowed the Murrays to introduce the following evidence of damages: (1) Hadid assigned the contract to the Partnership for $984,000; (2) he received 15% interest in the Partnership; (3) at the time of trial he had made approximately $917,000 in profits from the property;[1] and (4) the Partnership sold half of the property in 1986 for $6.7 million. The jury awarded the Murrays the exact amount Hadid received when he assigned the contract to the Partnership. The jury was aware of Hadid's assignment price; however, it heard absolutely no evidence with regard to what the Murrays would have done with the contract.

On appeal, the Murrays argued that the jury was entitled to believe that they could have assigned the contract for $984,000, or, alternatively, that they would have made a $917,000 profit from selling their interest in the property. The Murrays, however, introduced no evidence to support these contentions.[2] On the contrary, the Murrays' evidence at trial indicated that they would not have assigned the contract to anyone nor would they have sold

---

[1] This amount was contained in Hadid's answer to one of the Murrays' interrogatories which sought to determine the amount of profits he had made in his dealings with the Roper tract.

[2] Another theory advanced by the Murrays was that the verdict simply represented passive appreciation of the real estate between November 11, 1983, and July 27, 1984, when Hadid assigned the contract. No evidence of appreciation was introduced, and the theory is inapplicable because of Hadid's efforts in rezoning, engineering, and site planning the property.

their interest in the property; they argued throughout the trial that they would have developed the property themselves.

The usual remedy in an action for fraud is to restore the defrauded party to the position he held prior to the fraud. *Jefferson Stand. Ins. Co. v. Hedrick*, 181 Va. 824, 833, 27 S.E.2d 198, 202 (1943), citing *National Bank, etc., Co. v. Petrie*, 189 U.S. 423, 425 (1902). In the present action, the Murrays did not actually lose anything as a result of Hadid's fraud. They are in the same position in which they were prior to the fraud. Because there was no proof that actual damages were proximately caused by Hadid's fraud, the trial court correctly set aside the $984,000 jury award.

## B. *Lost Profits/Business Opportunity*

Finally, the trial court set aside the damage award on the basis that the Murrays' claimed damages were too speculative. At trial and on appeal, the Murrays argued that the jury's award was justified in light of the instruction on damages which stated that the Murrays were entitled to recover any "gains prevented which [were] a direct and natural result of the fraud." The Murrays argued that their "gains prevented" by Hadid's fraud were their lost opportunity to develop the property or sell the contract on the property. Thus, they are arguing that they lost some benefit they would have received if they had acquired the contract on the property.

A plaintiff is not required to prove the exact amount of his damages; however, he is required to show sufficient facts and circumstances to permit a jury to make a reasonable estimate of those damages. *Manss-Owens Co. v. Owens & Son*, 129 Va. 183, 205, 105 S.E. 543, 550 (1921). "It is well settled that . . . prospective profits are not recoverable in any case if it is uncertain that there would have been any profits. . . ." *Sinclair v. Hamilton & Dotson*, 164 Va. 203, 211, 178 S.E. 777, 780 (1935).

As previously noted, contrary to the Murrays' argument on appeal, evidence at trial indicated that they would not have assigned the contract to anyone. They argued fervently that they would have developed the property themselves and reaped tremendous profits.

The Murrays argued that, had they developed the property, they would have made at least as much as the Partnership: $2.7 million from the sale of townhouses it built on the property. They

also claimed they would have made the $666,666 builder's fee which was paid directly to the builder, Georgelas and Sons.

When an established business is interrupted and sustains loss, evidence of its past profits, and estimates of future profits derived therefrom, are admissible to permit an estimate of damages. *Krikorian v. Dailey*, 171 Va. 16, 30, 197 S.E. 442, 448 (1938).

> But where a new business or enterprise is involved, the rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages. (Citations omitted.)

*Mullen v. Brantley*, 213 Va. 765, 768, 195 S.E.2d 696, 700 (1973).

Prior to their interest in the Roper property, the Murrays had never built a townhouse development. Their experience in building was limited to large custom homes. Thus, the townhouse development would have constituted a new enterprise dependent upon too many contingencies to safeguard an estimate of damages. The fact that the Partnership and Georgelas and Sons profited from their development of the property gives absolutely no indication of how the Murrays would have fared. The trial court, therefore, correctly ruled that the Murrays' evidence regarding the profits made by the Partnership and the builders fees collected by Georgelas and Sons was speculative, because the Murrays did not prove that they would have performed in the same manner.

## C. *Punitive Damages*

As the Murrays recognized in their opening brief, an award of punitive damages must be predicated upon an award of compensatory damages. *Gasque v. Mooers Motor Car Co.*, 227 Va. 154, 159, 313 S.E.2d 384, 388 (1984). Because we have ruled that no compensatory damages were recoverable, we must necessarily deny the punitive damage award.

## III. *MOTION FOR SANCTIONS*

The Murrays argue that their motion for sanctions against Hadid for discovery abuse was a collateral matter not disposed of by final judgment on their motion for judgment. Despite the trial court's stated intention to deal with the motion separately, the motion arose under the same cause of action upon which the trial court entered final judgment on May 4, 1988. The trial court never officially separated the motion for sanctions from the Murrays' case in chief.

■ "All final judgments . . . shall remain under the control of the trial court and *subject to be modified, vacated, or suspended* for twenty-one days after the date of entry, and no longer." Rule 1:1. (Emphasis added.) The record fails to indicate that before the judgment became final the Murrays filed a motion to modify, vacate, or suspend the final judgment in order to preserve their motion for sanctions. Thus, after twenty-one days elapsed, the trial court no longer had jurisdiction over the matter.

## IV. *CONCLUSION*

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*

Justice Stephenson, with whom Chief Justice Carrico and Justice Thomas join, dissenting.

I respectfully dissent.

I concur with the majority's conclusion in Part I of its opinion. I agree, therefore, that the trial court erred in supporting its order to set aside the verdict on the fraud claim with its prior ruling that the Murrays acted illegally.

I do not agree, however, with the majority's conclusion that the jury's damage award is unsupported by the evidence. Without objection, the trial court instructed the jury that if it found its verdict in favor of the Murrays, they were entitled to recover as damages "all of the loss they sustained including *gains prevented* which [were] a direct and natural result of the fraud." (Emphasis added.) This instruction, therefore, became the law of the case.

The Murrays testified that, but for their reliance upon Hadid's representations, they would have purchased the property. By its verdict, the jury found this to be so. Indeed, as the trial court correctly noted, "[t]he jury has answered . . . for the [Murrays] insofar as their claim that they would have purchased the property. And that would stand." Moreover, it is undisputed that Hadid was paid $984,000 to "flip" the contract six months after he had accepted it, and that Hadid's assignee later sold a portion of the property for $6,700,000.

By its verdict, the jury reasonably inferred that, had the Murrays purchased the property, they likewise could have profited. Thus, these were "gains prevented" that proximately resulted from Hadid's fraud. The Murrays' losses, therefore, were real and certain — not speculative. Accordingly, I would hold that the evidence supports the jury's award of compensatory damages.

I also would hold that the evidence, viewed in the light most favorable to the Murrays, supports the jury's award of punitive damages. Indeed, there is ample evidence, both direct and circumstantial, that Hadid acted with actual malice toward the Murrays or acted under circumstances amounting to a willful and wanton disregard of the Murrays' rights. *See Jordan* v. *Sauve and Koons*, 219 Va. 448, 247 S.E.2d 739 (1978).

Therefore, I would reinstate the jury verdict, allowing both compensatory and punitive damages.