# TechDyn Systems Corporation

## v.

# Whittaker Corporation

Record No. 920639

February 26, 1993

Present: All the Justices

*Garry R. Boehlert (Benjamin T. Riddles, II; Douglas C. Proxmire; Watt, Tieder, Killian & Hoffar*, on briefs), for appellant.
*Peter B. Work (Janis Orfe; Amy J. Mauser; William J. Carey; Crowell & Moring; Miles & Stockbridge*, on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

The primary issue we consider in this appeal is whether a plaintiff, who filed an action for breach of contract, presented sufficient evidence from which a jury could find that the plaintiff's damages were attributable to the acts and omissions of the defendant.

TechDyn Systems Corporation filed its amended motion for judgment against Whittaker Corporation alleging that Whittaker breached its obligations to perform the terms of a contract. TechDyn sought, among other things, compensation for all unreimbursed delay damages that it incurred as well as lost profits. Whittaker denied any contractual breaches and filed a counterclaim for damages for work performed beyond the scope of the contract.

A jury returned a verdict in favor of TechDyn in the amount of $2,101,000 on its claim for delay and a verdict in favor of Whittaker on its counterclaim of $564,676. Both parties filed post-trial motions and the trial court set aside the jury's verdict for TechDyn and entered judgment in favor of Whittaker for $564,676. We awarded TechDyn an appeal, and agreed to consider Whittaker's assignment of cross-error.

## I. Facts

Although the trial court set the verdict aside, we accord the recipient of a jury verdict the benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn therefrom. Therefore, we will state the facts most favorable to TechDyn regarding its claim for delay damages, and if there is any credible evidence in the record which supports the jury's verdict, then we must reinstate that verdict and enter judgment thereon. *Holland* v. *Shively*, 243 Va. 308, 309-10, 415 S.E.2d 222, 223 (1992).

In 1985, the United States Air Force decided to install an air-to-ground tactical warning and control system in Iceland. The system, a sophisticated electronics network for the command and control of tactical aircraft and ships, is referred to as the Iceland Command and Control Enhancement Project ("Iceland Project").

The Air Force had extensive discussions with Command, Control and Communications Corporation, which had the experience and computer software necessary for aircraft warning and control systems. The Air Force, however, decided to award the contract for the

Iceland Project to a qualified small business through the Small Business Administration's 8A program and to direct the successful contractor to subcontract a substantial portion of the work to Command, Control and Communications Corporation.

The Air Force selected TechDyn as the general contractor and executed a contract with TechDyn, which is referred to as the prime contract. This contract directed that TechDyn obtain ''all hardware, software and related documentation for the processing and display functional area . . . as defined in the statement of work and specifications from Command, Control and Communications Corporation.'' TechDyn executed a subcontract with Command, Control and Communications Corporation as required by the prime contract.

Shortly after the subcontract was awarded, Command, Control and Communications Corporation was acquired by Whittaker Command and Control Systems, which assumed all obligations and liabilities under the subcontract. Later, Whittaker Corporation, acting through its Whittaker Electronics Systems division, assumed Whittaker Command and Control Systems' obligations and liabilities under the subcontract.

Leo S. Morrison, Jr., chairman of the board and president of TechDyn, testified that the date of completion for the processing and display functional area of the Iceland Project was December 31, 1986. According to Morrison, completion of the project was delayed because of numerous contractual breaches committed by Whittaker. For example, David Yennowine, TechDyn's supervisor of subcontracts and purchasing, received a letter from Marie E. Raymond, Whittaker's director of contracts, informing TechDyn that work on the project would be delayed because of Whittaker's corporate reorganization.

A series of mergers and acquisitions at Whittaker and its acquired companies caused numerous personnel changes and further delayed work on the Iceland Project. Morrison testified that each time there was a change in personnel, key people from the Whittaker organization ''disappeared'' and new people ''who had not been involved in the project . . . came on the scene.''

Donald Ray Ellis was TechDyn's project manager. He and certain Air Force officials were present when Whittaker employees undertook performance verification tests on software provided by Whittaker. Numerous deficiencies in the operational software were discovered, and the Air Force refused to accept it. There were so many failures that Ellis and an Air Force program manager requested a

meeting with Whittaker's representatives to resolve the poor state of operational software. Other tests disclosed deficiencies in the operational software, and the Air Force declared the software unacceptable.

In 1988, T. Brancati, president of Whittaker, informed TechDyn that Whittaker intended to stop its work on the Iceland Project and ordered TechDyn to remove its equipment from Whittaker's facilities within 30 days. Furthermore, Whittaker informed TechDyn that if it failed to remove its equipment, TechDyn would be charged $20,000 per month in rent.

TechDyn approached the Air Force several times seeking permission to terminate its subcontract with Whittaker, but the Air Force refused. TechDyn eventually terminated Whittaker with respect to other portions of the work because TechDyn was not contractually required to acquire those services from Whittaker.

TechDyn filed a claim with the Air Force requesting an equitable adjustment to the prime contract for numerous reasons, including certain delay attributable to the Air Force. After extensive negotiations, the Air Force made an equitable adjustment, and TechDyn received a settlement of approximately $1.7 million. TechDyn's claim against the Air Force did not represent compensation for any delay or damages caused by Whittaker.

Greg D. Crider, a consultant, was permitted to testify as an expert witness on behalf of TechDyn. Crider, who had extensive experience identifying causes of delays on construction projects, performed a schedule analysis on the Iceland Project.

At trial, Crider was asked to analyze the Iceland Project, identify the delays that occurred, and describe the effect of the delays on the overall project completion. Crider identified critical delays in four major areas: software design, software development, software testing and correction, and final system delivery. Crider attributed a total of 53 months of critical delay solely to Whittaker. Crider testified that TechDyn was not claiming compensation for any delay that was attributable to the Air Force.

William Curtis Hise, TechDyn's vice president and director of management support operations and chief financial officer, also testified regarding the Iceland Project's delays. He stated that TechDyn incurred 1,243 days of delay which were attributable to Whittaker and that TechDyn incurred damages of $2,068 per day as a result of such delay.

## II. TechDyn's Damages

TechDyn argues that the trial court erred by setting aside the jury's verdict and entering judgment for Whittaker because it (TechDyn) presented evidence which would permit a jury to find that TechDyn's delay damages were caused by Whittaker's contractual breaches. Whittaker argues, however, that TechDyn's delay damages were caused by numerous factors, some of which were not attributable to Whittaker, and that TechDyn failed to apportion those damages which were specifically caused by Whittaker.

■ We have held that where there is evidence of damage from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible. *Carr* v. *Citizens Bank & Trust*, 228 Va. 644, 652, 325 S.E.2d 86, 90 (1985); *Cooper* v. *Whiting Oil Co.*, 226 Va. 491, 496, 311 S.E.2d 757, 761 (1984); *Sachs* v. *Hoffman*, 224 Va. 545, 549, 299 S.E.2d 694, 696 (1983); *Pebble Bldg. Co.* v. *G.J. Hopkins, Inc.*, 223 Va. 188, 190, 288 S.E.2d 437, 438 (1982).

We have discussed this legal principle on numerous occasions. In *Hale* v. *Fawcett*, 214 Va. 583, 202 S.E.2d 923 (1974), Blake Fawcett filed an action against Joseph Hale for damages to a corn crop and farmland caused by Hale's trespassing hogs and cattle. Fawcett was only entitled to recover damages caused by the cattle entering his farm through a narrow space between a cattle guard and a gate post. Fawcett was not entitled to recover for damages caused by cattle entering through or over an existing division fence. No evidence was produced which enabled the jury to form a reasonable estimate of that portion of the damage caused by the cattle entering through the narrow opening and the portion of the damage caused by cattle entering through or over the division fence. Thus, we reversed the judgment in favor of Fawcett because he failed to prove with reasonable certainty the share of damages for which Hale could be held liable. *Id.* at 586, 202 S.E.2d at 925.

In *Pebble Building, supra,* we considered whether the evidence was sufficient to sustain an award of delay damages in favor of a subcontractor against the general contractor. Pebble Building Company was the prime contractor for the construction of a municipal parking facility. In submitting its bid to perform the electrical work, Hopkins, a subcontractor, estimated that performance of its contract would require approximately 7,700 man hours and that its labor

costs would be $38,773.65. Upon completion of the work, Hopkins had expended about 14,000 hours and incurred labor costs of $76,744.28.

Hopkins filed an action to recover its actual labor costs in excess of its estimated labor costs. Hopkins alleged that the excess was attributable to delay caused by Pebble. The trial court, sitting without a jury, decided that Pebble was responsible for an unexcused project delay and assessed delay damages against Pebble and its bonding company.

On appeal, Pebble and its bonding company argued that the trial court imposed damages for delay not shown by the evidence to be attributable to Pebble. Rejecting their argument, we held that there was sufficient evidence to sustain the factual finding that Pebble caused the delay for which damages were awarded. We stated:

> This case is unlike *Hale* v. *Fawcett*, 214 Va. 583, 202 S.E.2d 923 (1974), upon which defendants heavily rely. There, this Court reversed a judgment in favor of the plaintiff in a negligence action when there was evidence of damages from separate causes, as to a portion of which defendant was not responsible. The Court held that the plaintiff failed to prove with reasonable certainty the share of the damage for which defendant could be held liable. But here, Hopkins proved with sufficient certainty that failures of commission and omission of Pebble resulted in the delays for which plaintiff was awarded damages. Thus, there is no merit to defendants' claim that Hopkins' evidence failed to allocate the damages between extra work caused by Pebble and extra work resulting from delays alleged not to be Pebble's responsibility.

*Id.* at 190, 288 S.E.2d at 438.

■ We hold that TechDyn proved with sufficient certainty that the failures of commission and omission by Whittaker resulted in the delay for which TechDyn was awarded damages. As we mentioned earlier, the record shows Whittaker admitted certain delays that were attributable to its corporate reorganizations and numerous personnel changes. Other delay occurred as the result of numerous deficiencies in Whittaker's operational software that the Air Force declined to accept. TechDyn's expert, Crider, identified critical delay that he attributed solely to Whittaker's performance and no other cause. Hise, TechDyn's vice president, also testified that the

1,243 days of delay were attributable to Whittaker's nonperformance of the contract. Finally, Scott Douglas Gray, an expert in the area of contract costs and damages, testified that these delay costs were attributable directly to Whittaker.

 It is true that Whittaker presented evidence and argued at trial that the delay damages that TechDyn incurred were attributable to causes other than Whittaker's contractual breaches. However, once TechDyn met its *prima facie* burden of producing evidence to show within a reasonable degree of certainty the share of damages and delay for which Whittaker was responsible, it was the jury's province to resolve any factual disputes. Thus, we hold that TechDyn proved its delay damages with the requisite degree of reasonable certainty and that the trial court erred by setting aside the jury verdict.[1]

## III. TechDyn's Lost Profits

TechDyn also argues that the trial court erred by striking its claim of lost profits. The gist of TechDyn's claim for lost profits is that because of the delay caused by Whittaker, certain TechDyn employees were required to continue their work on the Iceland Project and were unavailable to prepare proposals to secure work on other projects. Additionally, TechDyn asserts that these employees were unavailable to work on other projects that TechDyn may have successfully obtained.[2]

██ We have stated that damages are recoverable for loss of profits prevented by a breach of contract ''only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.'' *Boggs* v. *Duncan*, 202 Va. 877, 883, 121 S.E.2d 359, 363 (1961). *See Murray* v. *Hadid*, 238 Va.

---

[1] Whittaker, relying upon *Massie* v. *Firmstone*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922), argues that certain TechDyn officials testified that its delay was attributable to factors other than Whittaker and, thus, TechDyn is bound by this testimony. We have reviewed the extensive record and conclude that this contention lacks merit. Additionally, we find no merit in Whittaker's assertion that TechDyn's damage calculation of $2,068 per day is speculative. Our review of the record reveals that this calculation is supported by credible evidence.

[2] There is no merit to TechDyn's argument that the trial court should have permitted it to present additional testimony before striking its claim of lost profits. The trial court specifically asked counsel for TechDyn whether the court had heard all the evidence TechDyn intended to present in support of this claim. Counsel informed the court that TechDyn had presented its evidence.

722, 731, 385 S.E.2d 898, 904 (1989); *ADC Fairways Corp.* v. *Johnmark Constr., Inc.*, 231 Va. 312, 318, 343 S.E.2d 90, 93 (1986). Lost profits that are speculative, remote, uncertain, or contingent are not recoverable. *Murray*, 238 Va. at 731, 385 S.E.2d at 904; *Boggs*, 202 Va. at 883, 121 S.E.2d at 363.

■ Our review of the record indicates that, at best, TechDyn's purported lost profits are remote, speculative, and uncertain and, therefore, not recoverable. There is no evidence in the record which indicates that TechDyn would have been the successful bidder on any of these proposals. Additionally, there is no evidence in the record that the employees whom TechDyn contended were unavailable to develop proposals to obtain new projects had any history of attracting new projects for TechDyn. Furthermore, TechDyn failed to offer sufficient evidence to demonstrate why it did not obtain the other proposals or that Whittaker's delay affected its ability to obtain these proposals. Thus, we hold that the trial court did not err by excluding the speculative evidence of lost profits.

## IV. Whittaker's Counterclaim Damages

Steven Jones, Whittaker's manager of off-site services, and Claudia Justis, a Whittaker engineer, were directed by their supervisors to compile certain data relating to the number of hours of work performed by Whittaker employees outside of the scope of the subcontract. Jones and Justis obtained this information from other Whittaker employees and presented it to .Raymond and Jack Charles Cannady, another Whittaker employee. This data was also used to create a one-page summary of Whittaker's damages, which was admitted in evidence as an exhibit over TechDyn's objections.

TechDyn contends that this evidence was inadmissible hearsay because the exhibit and the testimony of Raymond, Justis, Cannady, and Jones were based upon uncorroborated out-of-court estimates of damages prepared by others. In response, Whittaker argues that its exhibit was developed by Whittaker employees who had personal knowledge of the Iceland Project and that the exhibit and testimony of its employees were properly admitted.

We discussed hearsay evidence in *Williams* v. *Morris*, 200 Va. 413, 105 S.E.2d 829 (1958):

Hearsay evidence has been defined as evidence which derives its value, not solely from the credit to be given the wit-

ness on the stand, but in part from the veracity and competency of some other person. It is primarily testimony which consists in a narration by one person of matters told him by another. . . . A clear example of hearsay evidence is where a witness testifies to the declaration of another for the purpose of proving the facts asserted by the declarant. . . . Statements otherwise objectionable as hearsay are not rendered admissible because they have been reduced to writing.

Id. at 416-17, 105 S.E.2d at 832 (citations omitted). *See also Stevenson* v. *Commonwealth*, 218 Va. 462, 464-65, 237 S.E.2d 779, 781 (1977); *Lee* v. *Artis*, 205 Va. 343, 346, 136 S.E.2d 868, 870 (1964).

 We have reviewed the exhibit and the testimony of each of these witnesses, and we hold that the trial court erred by admitting this evidence. None of these witnesses had any direct knowledge of the damages that Whittaker purportedly incurred as a result of the expansion of its work. The Whittaker employees who actually compiled the data for Jones and Justis did not testify at trial. Neither Justis nor Jones gave any testimony at trial relating to Whittaker's alleged damages. Neither Cannady nor Raymond had any personal knowledge of the facts which formed the basis of the alleged estimates of damages provided to them by other Whittaker employees. Thus, the testimony of Cannady and Raymond was hearsay because it derived its value "in part from the veracity and competency of some other person," *Williams* v. *Morris*, 200 Va. at 416, 105 S.E.2d at 832, and the exhibit was inadmissible for the same reason. Therefore, we cannot approve the jury verdict in favor of Whittaker because the improperly admitted hearsay evidence formed the sole basis of the counterclaim for damages.

## V.

Accordingly, we will reverse that portion of the trial court's judgment which set aside the jury verdict and we will reinstate the jury verdict of $2,101,000 in favor of TechDyn; we will affirm that portion of the judgment of the trial court that dismissed TechDyn's claims for lost profits; we will reverse that portion of the judgment that affirmed the verdict in favor of Whittaker, thus denying the

counterclaim; and, we will enter final judgment here in favor of TechDyn.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*