COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Russell and Athey
Argued by teleconference

**PUBLISHED**

OLMEDO ALBERTO PENA PINEDO

v.      Record No. 0515-19-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
MAY 5, 2020

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

Bernadette M. Donovan (Donovan & Engle, PLLC, on briefs), for
appellant.

Leanna C. Minix, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


On January 16, 2018, a grand jury in the Circuit Court of Rockingham County ("circuit

court") indicted appellant Olmedo Alberto Pena Pinedo ("Pena")[1] for (1) aggravated malicious

wounding, in violation of Code § 18.2-51.2, (2) use of a firearm in the commission of a felony,

in violation of Code § 18.2-53.1, (3) conspiracy to commit robbery, in violation of Code

§§ 18.2-22, 18.2-58, and (4) robbery, in violation of Code § 18.2-58. Because the victim later

died from his injuries, the circuit court granted the Commonwealth's motion to *nolle prosequi*

the aggravated malicious wounding charge. On May 21, 2018, a grand jury indicted Pena for

first-degree felony murder, in violation of Code § 18.2-32. On December 6, 2018, a jury found

Pena guilty of all charges.

---

[1] The parties both refer to the appellant by his paternal surname, "Pena." At trial,
witnesses and counsel also referred to Pena as "Albert." For consistency, we refer to him by his
paternal surname.

On appeal, Pena argues that the circuit court "erred when it refused to instruct the jury with the model instruction regarding a claim-of-right defense."

## I. BACKGROUND

In the light most favorable to Pena as the proponent of the instruction, the facts are as follows: in August of 2017, Pena moved in with his cousin, Luis Lafferty ("Lafferty") in Harrisonburg, Virginia. Pena and Lafferty went into "business" together selling drugs and trading firearms. Lafferty and T.B., a minor who had run away from the custody of the Department of Social Services, had "a sexual relationship" with each other. At the same time, T.B. was also "in a relationship" and living with Kamau Imani ("Imani").

A few weeks before October 19, 2017, while T.B. was still "on the run," Lafferty picked her up and brought her to his house. T.B. and Lafferty had intercourse, after which Lafferty left the room. With Lafferty gone, T.B. "took [the] opportunity" to steal about $5,000[2] in "drug money," jointly collected by Lafferty and Pena. Lafferty and Pena made this money by "[s]elling drugs" together. After stealing the money, T.B. immediately left and was picked up by Imani and his friend, Marlin Glascoe ("Glascoe").[3]

Lafferty told Pena what happened, and the two men drove around looking for T.B. They could not find her "on foot," even though there were only two ways into the subdivision. Lafferty realized that someone had picked her up and suspected it was Imani. Lafferty had heard that Imani "set [T.B.] up . . . to rob" him. Less than twenty minutes later, because Lafferty was upset about the theft, he sent T.B. a message on "Snapchat," an internet social media platform,

---

[2] Lafferty testified that $5,600 was stolen, but T.B. only admitted to stealing $5,000. The difference, however, is immaterial to our analysis.

[3] Although Glascoe denied picking up T.B. on October 19, 2017, he testified that he had never picked up T.B. without Imani. T.B. specifically testified that Glascoe drove the vehicle that picked her up, but Imani was also in the vehicle.

stating, "[A]re you really going to do this to me?" T.B. blocked Lafferty's messages. Lafferty

assumed that T.B. was going to give the money to Imani. On October 12, 2017, T.B. received a

message from Pena on "Snapchat" that stated, "when I find you and trust me, I'm going to make

sure you stay missing, starting with your family."

On the evening of October 19, 2017, Jessie Pulliam ("Pulliam") and his friend, Shane

Pouncey ("Pouncey"), went to Lafferty and Pena's house. Pouncey contacted T.B. through

"Snapchat" in order to purchase marijuana as a "set up" to retrieve the stolen money. The

exchange was set to occur at Hunter's Ridge apartments in Harrisonburg, Virginia. Pena told

Lafferty that they needed to "go handle some business." The group got into Pulliam's SUV, and

Pena told Lafferty that "Shane Pouncey had set up [T.B.]. That we were going to go get our

money back." They started driving to Hunter's Ridge apartments. During the ride, Pouncey

used Pulliam's phone to message T.B. about the arrangement.

Glascoe drove T.B. and Imani to Hunter's Ridge apartments. Imani sat in the passenger

seat, and T.B. sat behind him. After a short period, the vehicle driven by Pulliam pulled behind

Glascoe's vehicle. Pena and Lafferty directed Pulliam to stop behind Glascoe's vehicle "so it

could not pull out at all." Pena approached the passenger side of Glascoe's vehicle, while

Lafferty approached the driver's side. Both men were armed. Lafferty and Pena said, "where's

our money."[4] Pena opened the passenger door and patted down Imani. At some point, Pena took

"a few hundred dollars" from Imani. Pena shot Imani in the neck and then left with Lafferty,

Pouncey, and Pulliam in Pulliam's vehicle. Pena directed Pulliam to drive toward Blue Ridge

---

[4] T.B., Glascoe, and Pouncey testified that the men said to give them "everything." However, Lafferty testified that he yelled "where's the money at" while Pena yelled, "where's my money at?" Although there is conflicting evidence on what was said, for the purposes of the assignment of error, we view the evidence in the light most favorable to Pena. See Fahringer v. Commonwealth, 70 Va. App. 208, 211 (2019).

Community College. On the way, Pouncey asked Pena for some money from the incident, and Pena "handed him a wad." Pena eventually went "on the run" while Lafferty turned himself in.

Meanwhile, Imani was "bleeding and gasping for air," so Glascoe drove him to the hospital. When Imani arrived at RMH Sentara Hospital, he was in critical condition, bleeding profusely. Imani later died of his injuries. After the incident, police found some marijuana and a scale inside Glascoe's vehicle. Police eventually apprehended Pena in Beckley, West Virginia.

At trial on December 4-6, 2018, the Commonwealth presented evidence from various informants. An informant named Bobby Diehl ("Diehl") testified about statements Pena made to him while they were incarcerated together. Diehl testified that Pena stated that "they had set up a meeting with [Imani] because of some money that had disappeared from a girl that [Imani] was with at the time." At the "meeting," Pena said, "where's my fucking money," and Imani replied that "he didn't have" Pena's money. When Pena "went to hit him with his pistol," the weapon fired and shot Imani.

The defense did not call any witnesses. After the defense rested, Pena sought a jury instruction on the "claim of right" defense. The proposed instruction stated, "If you believe the defendant took the property he is charged with stealing under a belief that he had a good faith claim of right to take it, then, even though his belief was mistaken, you shall find the defendant not guilty of robbery." The circuit court ruled that there was not more than a scintilla of evidence to support the instruction. In interpreting Butts v. Commonwealth, 145 Va. 800 (1926), the circuit court found that a claim of right instruction requires "more than a mere belief," but also good faith. In this case, the circuit court found that there was not more than a scintilla of evidence that the belief was in good faith.

The jury was instructed on first-degree felony murder, second-degree murder, involuntary manslaughter, robbery, conspiracy to commit robbery, and use of a firearm in the commission of

a robbery. The jury found Pena guilty of first-degree felony murder and all other charges for which he was indicted.

## II. ANALYSIS

### A. Standard of Review

Generally, "the matter of granting and denying [jury] instructions does rest in the sound discretion of the trial court." Cooper v. Commonwealth, 277 Va. 377, 381 (2009). "This Court's 'sole responsibility in reviewing' the trial court's decision 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Graves v. Commonwealth, 65 Va. App. 702, 707 (2016) (quoting Cooper, 277 Va. at 381). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction," in this case Pena. Fahringer v. Commonwealth, 70 Va. App. 208, 211 (2019) (quoting Williams v. Commonwealth, 64 Va. App. 240, 244 (2015)).

A defendant is only "entitled to an instruction upon his theory of the case" when "such instruction is supported by *some appreciable evidence*." Williams, 64 Va. App. at 246 (quoting Harris v. Commonwealth, 134 Va. 688, 695 (1922)). In order for a jury to be properly instructed on a matter, "[m]ore than a scintilla of evidence must be present to support an instruction." Id. (alteration in original) (quoting Eaton v. Commonwealth, 240 Va. 236, 255 (1990)). "[T]he weight of the credible evidence that will amount to more than a mere scintilla of evidence is a matter to be resolved on a case-by-case basis." Id. at 247 (quoting Brandau v. Commonwealth, 16 Va. App. 408, 411 (1993)).

### B. Jury Instruction

Pena argues that there was more than a scintilla of evidence to support a claim of right instruction because there was evidence that he and Lafferty were simply reclaiming the money

that was stolen from them.[5]  When successful, the claim of right defense negates a defendant's *mens rea* specific intent requirement for conviction for certain offenses such as the "intent to steal" requirement for a larceny conviction.  Groves v. Commonwealth, 50 Va. App. 57, 63 (2007).  By doing so, it operates as an affirmative defense in the Commonwealth to several offenses, including robbery.  See Butts v. Commonwealth, 145 Va. 800, 813 (1926).

Robbery is a crime against possession of property, not its ownership.  See Johnson v. Commonwealth, 215 Va. 495, 496 (1975) ("In the commission of robbery the property must be taken by force and violence, not necessarily from the owner, but from any person in possession thereof *whose right of possession* is superior to that of the robber." (emphasis added)); Clay v. Commonwealth, 30 Va. App. 254, 259-60 (1999); see also People v. Hamilton, 47 Cal. Rptr. 2d 343, 347 (Cal. Ct. App. 1995) ("As a rule, robbery may be committed against a person who is not the owner of property—indeed, it may be committed against a thief.  There is no requirement that the victim have an absolute right to possession of the property. . . . [I]t is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner." (internal citations omitted)); People v. Scearce, 87 P.3d 228, 231 (Colo. App. 2003); People v. Aughinbaugh, 266 N.E.2d 530, 531-32 (Ill. App. Ct. 1970); State v. Stoops, 603 P.2d 221, 228 (Kan. Ct. App. 1979) (stating that "ownership of property taken is not an element of robbery"); People v. Green, 841 N.E.2d 289, 291 (N.Y. 2005).

However, in contrast, a claim of right defense is based upon a *good faith* belief in an *ownership* or bailment interest in real or personal property or in the payment of a debt—not

---

[5] Pena admits to guilt for "some degree of homicide."  However, since he was prosecuted for first-degree *felony* murder, he argues that negating the *mens rea* for robbery would also provide a defense to his felony murder conviction by eliminating the underlying felony.  Strikingly, he was not indicted for any other form of homicide.

simply on a perceived right to possession of the property.[6]  It is typically raised in larceny or

trespass cases but, in the Commonwealth, it may also be applicable in the case of robbery.  "To

take property under a *bona fide* claim of right, as under a claim of ownership, or in a *bona fide*

attempt to enforce payment of a debt, *is not robbery though the taking be accompanied by

violence or putting in fear*."  Pierce v. Commonwealth, 205 Va. 528, 533 (1964) (emphasis

added); see also Butts, 145 Va. at 812-13 ("[T]here can be no larceny of the property taken if it,

in fact, is the property of the taker, or if he, in good faith, believes it is his, for there is lacking

the criminal intent . . . .").[7]

Nevertheless, "[t]he claim-of-right defense requires a predicate showing of 'good faith,' a

*bona fide* belief by the taking party that she has some *legal* right to the property taken."  Groves,

50 Va. App. at 63 (citations omitted and emphasis added).  "Usually the question of *bona fides* is

one for the jury, but where . . . the facts are undisputed, and only one conclusion could be fairly

drawn therefrom by reasonable men, it is a question of law for the court."  Butts, 145 Va. at 814.

A claim of right must be more than a "mere pretext covering the intent to steal."  Pierce, 205 Va.

at 533.

Here, there is evidence in the record that Pena intended to reclaim the money stolen by

T.B.  Lafferty testified that Pena told him that they "were going to go get [their] money back."

---

[6] This distinction between "loose custody" or mere dominion or control over property and actual ownership or title to such property explains why contraband can nevertheless be the subject of a larceny or robbery.  Those crimes turn not on the original possessor's good faith belief in an ownership or bailment interest in the property, but on having a superior possessory interest to the thief in the items stolen.

[7] For public policy reasons, some of our sister states broadly refuse to permit the claim of right defense to the offense of robbery on the theory that it is against public policy to permit the use of force or violence to exercise even a *bona fide* claim of right.  See, e.g., State v. McMillen, 925 P.2d 1088, 1090-91 (Haw. 1996) (holding that the statutory claim of right defense does not apply to robbery and noting the modern trend against applying the claim of right defense to robbery).

On October 19, 2017, while approaching the passenger side of Glascoe's vehicle, Pena said, "where's our money." The record also contains Diehl's testimony that Pena told him that "they had set up a meeting with [Imani] because of some money that had disappeared from a girl that [Imani] was with at the time." Thus, clearly there is more than a scintilla of evidence in the record before us that Pena had a subjective belief that he was entitled to reclaim the money stolen by T.B.

However, that does not end our analysis. The record is equally clear and undisputed that the stolen money was "drug money"—the proceeds of Lafferty and Pena's joint illegal drug distribution operation. Consequently, we must consider whether as a matter of law, one can have a good faith claim of a legal right in the proceeds from the sale of contraband.[8] For the following reasons, we conclude that one cannot.

"[C]ourts will not assist the participant in an illegal act who seeks to profit from the act's commission." Zysk v. Zysk, 239 Va. 32, 34 (1990) (applying the rule to a tort action), overruled on other grounds by Martin v. Ziherl, 269 Va. 35, 43 (2005); see also Desetti v. Chester, 290 Va.

---

[8] Here, the parties concede that the money in question is itself contraband. Although concessions of law are not binding on this Court and any distinction is not crucial to our analysis, we agree. Generally, the proceeds of criminal activity are considered derivative contraband. See Code § 18.2-246.3 (outlawing money laundering, which occurs when "any person knowingly . . . conduct[s] a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony"); Code § 18.2-46.3:2 (subjecting the proceeds of gang-related crimes to civil forfeiture); see also 18 Pa. Cons. Stat. § 5111 (2020) (setting forth the felony of dealing in proceeds of unlawful activities); cf. People v. Mudd, 370 N.E.2d 37, 38 (Ill. App. Ct. 1977) ("Derivative contraband describes an article, not inherently unlawful, which is subject to forfeiture only if it is used in an illegal activity."); State v. Seven Thousand Dollars, 642 A.2d 967, 972 (N.J. 1994) (defining "non-*prima facie*" contraband for purposes of forfeiture "also known as derivative contraband" as that which "is itself innocent in nature but has been used or is intended to be used in furtherance of an unlawful activity or is the proceeds of illegal activities"); Commonwealth v. One 1985 Dark Blue Mercedes Benz Car, 571 A.2d 482, 484 (Pa. Super. Ct. 1990) ("Also subject to forfeiture is property which has been derived from or used in furtherance of illegal activity, such as money derived from the illegal sale of drugs. This is known as derivative contraband.").

50, 56 (2015) (stating that in a malpractice action, "actual guilt is a material consideration [because] courts will not permit a guilty party to profit from his own crime" (alteration in original) (quoting Adkins v. Dixon, 253 Va. 275, 282 (1997))); Johnson v. Campbell, 258 Va. 453, 457 (1999) (explaining that the "main premise" for the illegality defense is "the idea that courts will not assist the participant in an illegal act who seeks to profit from the act's commission" (quoting Zysk, 239 Va. at 34)); cf. Massie v. Dudley, 173 Va. 42, 52 (1939) (explaining that the law will not assist a party in recovering money when an illegal contract has been fully executed, nor will it otherwise enforce an illegal contract for public policy reasons). The money Pena sought to reclaim was undisputedly the proceeds of criminal activity. Thus, to instruct the jury on the claim of right defense when the property sought to be reclaimed was the fruits of criminal transactions would be to assist the participant in an illegal act in benefitting from their criminal activities. To hold otherwise would be contrary to the clear public policy of the Commonwealth.

Similarly, although a matter of first impression in the Commonwealth, we also hold that as a matter of law and for the same reasons, one cannot have a *good faith* belief that one has a legal right to recover contraband or the fruits of a crime. See, e.g., People v. Hendricks, 749 P.2d 836, 839 (Cal. 1988) (finding that a claim of right instruction was properly refused when the defendant broke into a house to collect money "owed him for his services as a prostitute" when he "impliedly conceded he knew prostitution is illegal").

### III. CONCLUSION

For the foregoing reasons, we conclude that the circuit court properly found that there was not more than a scintilla of evidence of a good faith claim of right to support an instruction to that effect for the jury.

The judgment of the circuit court is therefore affirmed.

Affirmed.